## Merck & Co., Inc. v. United States

No. 5988.—Invoices dated Darmstadt, Germany, Sept. 24 and Oct. 29, 1937. Certified September 30 and November 5, 1937. Entered at New York, N. Y., October 15 and November 24, 1937. Entry Nos. 954712 and 779191.

(Decided February 29, 1944)

*Edward J. Flanagan* (*Edward J. Flanagan, Harry M. Farrell*, and *Charles A. Darius* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett* and *Daniel I. Auster*, special attorneys), for the defendant.

WALKER, Judge: These are appeals for reappraisement from findings of value made by the United States appraiser at the port of New York on Erythrol Tetranitrate tablets, a medicinal preparation, imported from Germany in October and November of 1937. Appraisement was made on the basis of United States value. It is apparently agreed that no export value for such or similar merchandise, as defined in section 402 (d) of the Tariff Act of 1930, existed at the time of exportation of the instant merchandise, for the reason that the importer had an exclusive purchaser agreement with the seller, a subsidiary or associate firm of which, so far as the record indicates, was the sole manufacturer in the country of exportation of merchandise such as or similar to that in issue.

The imported merchandise consisted of $\frac{1}{4}$ and $\frac{1}{2}$ grain tablets. There does not appear to be any doubt but that Erythrol Tetranitrate tablets of those quantities were not sold or offered for sale in Germany at the time of exportation, but it is the contention of the plaintiff that similar merchandise, to wit, 0.005 gram and 0.03 gram tablets, corresponding practically with $\frac{1}{13}$ and $\frac{1}{2}$ grain weights, of Erythrol Tetranitrate were freely offered for sale in Germany at the time of exportation of the merchandise in issue and that there did exist at that time the other elements to establish a foreign value, as defined in section 402 (c) of the tariff act, *supra*, prior to the passage of the Customs Administrative Act of 1938, for similar merchandise.

The statutes involved read as follows:

SEC. 402. VALUE.

\* \* \* \* \* \* \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs,

charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

The evidence offered on behalf of the plaintiff consists in the main of a price list issued by the manufacturers of the merchandise in question, the authenticity of which was established by the testimony of Dr. Carl R. Addinall, director of the library service of the plaintiff, and the testimony of Dr. Frederick A. Weiss concerning the character of the imported merchandise and that offered for sale in Germany.

The testimony of the latter indicates that Erythrol Tetranitrate is used in the treatment of chronic high blood pressure and, to a lesser extent, in the treatment of attacks of angina pectoris. The dosage range, as given in the United States Dispensatory, is ½ to 1 grain (0.032 to 0.065 gram). Dr. Weiss stated that the usual form in which it is used here is in tablets of ¼ to ½ grain. Abroad, Dr. Weiss said, the dosage range was from 0.005 to 0.06 gram, corresponding to ⅓ to 1 grain, and it was used in tablets of 0.005 and 0.03 gram (⅓ and ½ grain). When the attending physician determined the correct dosage required, he said, he could use tablets of any content available merely by adding or dividing to obtain the prescribed dosage.

The catalog referred to above was received in evidence as exhibit 1. It is in the German language, but a translation of the pertinent portions thereof was received in evidence as exhibit 2.

Under the situation in the case at bar the first inquiry must be to determine whether there existed a foreign value for merchandise such as or similar to that in issue at the time of exportation thereof.

Upon this feature of the case it appears that it is conceded that there was no foreign value for merchandise *such* as that in issue, to wit, Erythrol Tetranitrate tablets of ¼ and ½ grain content. It is, however, urged by the plaintiff that there was a foreign value for merchandise *similar* thereto, to wit, Erythrol Tetranitrate tablets of different content described in the price list, exhibit 1.

It is contended by the defendant that the merchandise described in the price list is not similar, for the purposes of section 402 (c), *supra*, to that involved herein, or, alternatively, even if it be found to be

similar, that restrictions imposed upon the resale thereof in the foreign market were such as to create a controlled market and negative the existence of a foreign value as defined in said section 402 (c). Since the evidence offered with respect to foreign value is entirely centered upon the merchandise described in the price list, a decision in favor of either of defendant's contentions disposes of the issues.

On the question of whether the market abroad was controlled, I find that on page 3 of the price list, as shown by the translation, exhibit 2, the following appears:

### RESALE CONDITIONS

Our granting of the price quotations stated in this list we make dependent upon the following conditions:

The purchasers bind themselves:

to deliver the MBK—Preparations only in original packages,

not to use the trademarks protected for us for the merchandise of others,

in price lists, offers and in sales promotion to refrain from any comparison of our MBK—Preparations with substitute preparations, in particular also to omit any comparative references,

not to prepare themselves, not to have prepared by a third party, any substitutes for the MBK—Preparations.

The MBK—Preparations may be disposed of only to the retailers, but not to the middlemen, and only in quantities corresponding to the domestic requirements of the business house in question. A supply for delivery stock maintained on the premises of firms in friendly relations with the purchaser and managed by those, is not permitted: Export and resale of the MBK—Preparations to foreign countries, inclusive of the Free Port districts, requires our expressly given consent.

Purchasing permits for narcotics are needed for such preparations as are marked with a cross (+).

Insofar as we grant in individual cases, while observing the sales arrangements we have made abroad, the permission for export, this is done under the following conditions:

1. The merchandise purchased for export is to be used only for export purposes and only for the country of destination mentioned in the order.

2. The merchandise can be purchased only at the export prices fixed for the corresponding country. Firms that wish to export our preparations from their stock, are obliged to obtain our consent thereto, and to pay the possibly resulting difference between the domestic and the foreign price.

3. Our wholesale customers are obliged to impose upon their customers the same obligations for the conditions stated under 1 and 2.

Referring to the foregoing, the following is said in the brief filed on behalf of the defendant:

It will be noted that we have called attention, under the heading of "Evidence," to certain restrictions in the home country with respect to the sale and delivery of these and other preparations, and accordingly it cannot be assumed that there was a free and open foreign market under our statute. Were we to assume that identical merchandise was actually being sold in Germany (which we do not concede) under the conditions imposed there can be no free and open market under the statutory definition of foreign value.

The merchandise here involved was imported prior to the effective date of the Customs Administrative Act of 1938, which limited foreign

value to the market value or price, etc., at which merchandise was freely offered for sale for home consumption—hence, an element to be considered in the case at bar is the situation in the principal markets of Germany with respect to sales or offers for sale of merchandise such as or similar to that in issue for export to countries other than the United States.

The "Resale Conditions" quoted above show that as to merchandise sold for home consumption resale thereof was expressly limited to retailers, middlemen being excluded, and export and resale to foreign countries of merchandise purchased for home consumption required consent of the manufacturer and conformance to the same restrictions as in the case of merchandise purchased for exportation. As to merchandise sold for export, the same was restricted to that use and to the destination mentioned in the order.

Under these circumstances the writer is of the opinion that under the rule laid down in numerous cases, the latest expression being in the case of *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. 131, C. A. D. 262, that any restraint upon the use of purchased goods prevents the free market contemplated by the foreign value provision of the Tariff Act of 1930, it must be held that the prices at which the merchandise described in the price list, exhibit 1, was offered for sale cannot constitute evidence of the foreign value of merchandise similar to that here involved.

At the close of the case for the plaintiff, defendant moved to dismiss these appeals "for failure of proof of any value other or different than the presumptively correct value returned by the appraiser." Section 501 of the Tariff Act of 1930 provides that—

\* \* \*. The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

The same section provides that the judge to whom an appeal to reappraisement is assigned "shall determine the value of the merchandise."

The presumption in favor of the values found by the appraiser has not been overcome, and in accordance with the mandate of the statute I deny the motion to dismiss but find the values of the merchandise at bar to be as returned by the appraiser.

Judgment will issue accordingly.